# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

RUBEN GUZMAN,

     Plaintiff

v.

BRIAN WARD, et. al.,

     Defendants

Case No.: 3:19-cv-00104-RCJ-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 30

     This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

     Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 30, 30-1 to 30-14, 32-1 to 32-6.) Despite being given two extensions of time (ECF No. 37, 38), Plaintiff did not file a response to the motion. Pursuant to the court's orders, Defendants to file two supplements to their motion regarding the status of Plaintiff's right-eye cataract surgery. (ECF Nos. 43, 45/47-1.)

     After a thorough review, it is recommended that Defendants' motion be granted.

## I. BACKGROUND

     Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act (ADA). (Compl., ECF No. 4.) The events giving rise to this action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC). (*Id.*)

On screening, Plaintiff was allowed to proceed with an Eighth Amendment deliberate indifference to serious medical needs claim based on allegations that prison officials knew he had cataracts in both eyes and needed surgery, but delayed providing surgery on either eye, and as a result he lost vision in both eyes and suffered injuries when trying to navigate the prison with his vision loss. Additionally, after they conducted surgery on one eye, he avers that they refused to perform surgery on the other eye because he had one good eye. That claim was allowed to proceed against defendants Dr. Marsha Johns, Candis (Brockway) Rambur, Gaylene Fukagawa, John Keast, Wesley Mattice, Isidro Baca, and the Doe optometrist (when Plaintiff learned his or her identity). (ECF No. 3.)

He was also allowed to proceed with a claim under the ADA based on allegations that he was essentially blind for a six-month period, yet defendants Mattice and Baca refused to provide Plaintiff an inmate aide or allow another inmate to help him, and as a result, his mobility was limited and he seriously injured himself when he fell down the stairs. (*Id.*)

Plaintiff was also allowed to proceed with an Eighth Amendment deliberate indifference to serious medical need claim against defendants Drs. Martin Naughton, Marsha Johns, and Joseph Walls, based on allegations that Plaintiff had previously injured his knee seriously when he fell down the stairs, but the Defendants refused to provide any corrective treatment, inhibiting his ability to walk. (*Id.*)

On July 13, 2020, the court issued a notice of intent to dismiss Wesley Mattice under Federal Rule of Civil Procedure 4(m), giving Plaintiff until August 12, 2020, to file a proof of service as to Mattice or demonstrate good cause as to why he was not timely served. To date, Mattice has not been served and Plaintiff has not set forth good cause for extending the service deadline further. Therefore, Mattice should be dismissed from this action without prejudice

under Rule 4(m). Plaintiff similarly has failed to ever identify the Doe optometrist; therefore, the Doe optometrist should be dismissed without prejudice.

In their motion for summary judgment, Defendants argue that the treatment Plaintiff received for his cataracts contradicts his claims of deliberate indifference, as he was approved for two cataract surgeries: the first was delayed for a period of time due to his diagnosis with thyrotoxicosis, and the second has been delayed due to the Covid-19 pandemic and associated complications, and Plaintiff has now been scheduled for the second cataract surgery. Defendants further contend that Plaintiff's knee pain has been treated with: instructions to lose weight; knee rehabilitation exercises to perform and knee sleeves; pain medication and creams as well as a cane and then walker; he was referred to an orthopedic specialist (Dr. Walls) who provided cortisone injections; and he was subsequently referred to an orthopedic surgeon (Dr. Shukla) for a consultation concerning left knee replacement.

Defendants further argue that the court should dismiss the ADA claim because Plaintiff never requested any accommodation or raised an issue of discrimination in an ADA request, a grievance, a kite or question to medical personnel seeking an escort to assist him when he was having issues with his vision, and therefore he failed to exhaust administrative remedies as to the ADA claim.

Finally, Defendants claim they are entitled to qualified immunity.

Even though Plaintiff failed to oppose Defendants' motion for summary judgment, the court must still evaluate Defendants' motion and supporting evidence and determine whether they have demonstrated that there is no genuine dispute of material fact and they are entitled to judgment as a matter of law. *See* LR 7-2(d) (the failure to oppose a motion for summary

judgment does not constitute consent to the granting of the motion as it does with respect to other motions).

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,*

477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

pleadings and set forth specific facts by producing competent evidence that shows a genuine

dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Eighth Amendment**

"The government has an 'obligation to provide medical care for those whom it is

punishing by incarceration,' and failure to meet that obligation can constitute an Eighth

Amendment violation cognizable under § 1983." *Colwell v. Bannister,* 753 F.3d 1060, 1066 (9th

Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976)).

A prisoner can establish an Eighth Amendment violation arising from deficient medical

care if he can prove that prison officials were deliberately indifferent to a serious medical need.

*Estelle*, 429 U.S. at 104. A claim for deliberate indifference involves the examination of two

elements: "the seriousness of the prisoner's medical need and the nature of the defendant's

response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other*

*grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698

F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

"A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further

significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at

1059 (citing *Estelle*, 429 U.S. at 104);  *see also Akhtar*, 698 F.3d at 1213.

If the medical need is "serious," the plaintiff must show that the defendant acted with

deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation

omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051,

1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or

even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action

under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).

Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

**1. Cataracts**

**a. Summary of Medical Records Re Cataracts**

On October 11, 2016, Plaintiff was seen on intake by Dr. Johns, and his history reflected cataracts, for which Plaintiff said surgery had been planned. He was ordered to have routine labs

drawn, as well as medications, and was to be referred to optometrist Dr. Seljestad for his eyes. (ECF No. 32-2 at 2; ECF No. 32-3 at 29-32; ECF No. 32-4 at 60; ECF No. 32-5 at 63.)

Plaintiff sent a kite on October 20, 2016, stating he had cataracts in his right eye, which the Washoe County Jail had evaluated and said he was virtually blind in the right eye. He asked for an appointment. He was advised he was on the list to see the eye doctor, but to be patient as the list was very long. (ECF No. 32-4 at 17.)

He saw Dr. Herzman for an eye examination on December 23, 2016, who diagnosed him with a mature cataract in the right eye and a dry eye. He was to return in six months to evaluate the cataract, and he was prescribed artificial tears. (ECF No. 32-5 at 44; ECF No. 32-2 at 2.)

On February 6, 2017, Plaintiff sent a kite stating that the eye doctor told him to put in a follow up kite for his right eye cataract. In response he was told he would be scheduled according to doctor's orders (to be seen in six months). (ECF No. 32-4 at 12.) Plaintiff sent a kite on March 6, 2017, asking if cataract surgery was approved, noting he had lost sight in his right eye, and his left eye was getting worse. In response, he was told he would be re-evaluated in June or July, and that cataract surgery was not recommended at that time. (ECF No. 32-4 at 10.)

Plaintiff sent a kite on March 13, 2017, asking how cataract surgery could not be recommended, stating that he was blind in the right eye, and the left eye was getting worse. He received a response stating, "According to Medical Directive 123, you do not qualify for cataract surgery at this time." (ECF No. 32-4 at 9.)

Plaintiff sent a kite on May 8, 2017, stating that he could not see out of his right eye, and his left eye was getting worse. He was told he was on the list to be scheduled to see the eye doctor. (ECF No. 32-4 at 5.)

Plaintiff sent a kite on June 21, 2017, stating that he lost sight in his right eye, and could barely see out of the left eye, and asked if he had an appointment. He was told that he was on the list to see the eye doctor. (ECF No. 32-3 at 101.) Plaintiff sent another kite asking to be seen for his eyes on July 19, 2017. He was told that he was on the list to see the eye doctor. (ECF No. 32-3 at 99.)

Plaintiff saw Dr. Seljestad for his mature cataract on October 12, 2017, who referred him to ophthalmology. (ECF No. 32-5 at 38; ECF No. 32-2 at 2.)

There is a notation in the Utilization Review Panel (URP) records that Dr. Seljestad recommended referral to ophthalmology, Dr. Fisher, for Plaintiff's mature cataract in the right eye for which he had light perception only. This was approved on October 31, 2017. (ECF No. 32-5 at 32, 35, 36; ECF No. 32-1 at 19.)

On December 28, 2017, Plaintiff sent a kite asking about his eye exam, and was told he was on the waiting list for ophthalmology. (ECF No. 32-3 at 91.)

He saw Dr. Johns for his annual appointment on January 29, 2018, who noted he had decreased visual acuity due to cataracts. (ECF No. 32-2 at 3.)

On February 16, 2018, Plaintiff sent a kite asking when he would be seen for his eyes, which had already been approved. In response, he was told that the ophthalmologist retired, and they were working on a new contract, and then all appointments would be scheduled on a priority basis. (ECF No. 32-3 at 86.)

On April 8, 2018, Plaintiff asked where he was on the list for his eye surgery. He was told he was still on the waiting list. (ECF No. 32-3 at 82.)

On May 28, 2018, Plaintiff sent a kite asking when he would see the eye doctor, noting he had seen the eye doctor the prior year, who said Plaintiff would be getting one eye fixed.

1  Plaintiff said his eye sight was getting bad, and he could hardly see. In response he was told that
2  they did not have an ophthalmologist under contract for the north, and once they did,
3  appointments would be scheduled again. (ECF No. 32-3 at 79.)

4      Plaintiff saw ophthalmologist Dr. Wolff on September 14, 2018, who recommended
5  cataract surgery in the left eye for now, indicating Plaintiff should return for re-evaluation of the
6  pupil in the right eye. (ECF No. 32-5 at 29-31; ECF No. 32-2 at 3.)

7      On September 19, 2018, there was a request to approve cataract surgery on the left eye,
8  which was authorized on September 25, 2018. (ECF No. 32-5 at 27-28; ECF No. 31-1 at 35.)

9      Plaintiff had a pre-operative examination for cataract surgery on October 11, 2018. He
10  was approved for surgery. (ECF No. 32-5 at 69; ECF No. 32-2 at 3.) He had the cataract surgery
11  on the left eye on October 17, 2018. (ECF No. 32-2 at 3.) He saw the eye doctor on
12  October 25, 2018, who noted he was doing well after cataract surgery on the left eye. He was
13  instructed to return in three weeks. (ECF No. 32-5 at 26.)

14      Plaintiff had an appointment with the eye doctor on November 15, 2018, which noted he
15  was doing well after the surgery. He was prescribed artificial tears and instructed to return in
16  three months. (ECF No. 32-5 at 25.)

17      On November 20, 2018, Plaintiff sent a kite asking when he would have the surgery on
18  his right eye, stating he had migraines and his eye watered a lot. In response, he was told he
19  would be scheduled to see the eye doctor. (ECF No. 32-3 at 73.) At that time he was given a
20  prescription for artificial tears for a year. (ECF No. 32-5 at 58.)

21      Plaintiff saw the eye doctor (presumably Dr. Seljestad) on December 20, 2018, who
22  diagnosed a dense/mature cataract in the right eye. He was given artificial tears. (ECF No. 32-5
23  at 24.)

Plaintiff sent a kite on January 7, 2019, stating that his eye had cataracts and his vision was severely impacted, and he was feeling pressure and pain in the eye, and asked it to be looked into. The response notes that Plaintiff had a pending eye doctor appointment the week of January 14, 2019, and referral for the cataract for the right eye. (ECF No. 32-3 at 67; ECF No. 32-5 at 78.) Villegas sent a referral for a right eye cataract evaluation on January 15, 2019, which was authorized on January 22, 2019. (ECF No. 32-5 at 19, 22, 58.)

He had another appointment on January 19, 2019, after he was called to the appointment several times. He discussed the pain associated with the mature cataract in the right eye. He was advised he had a pending appointment with the eye doctor. (ECF No. 32-2 at 4.) Plaintiff saw optometrist Dr. Seljestad for the cataract in his right eye on January 30, 2019. He was referred to an ophthalmologist. (ECF No. 32-5 at 20; ECF No. 32-2 at 4.)

Plaintiff saw ophthalmologist Dr. Wolff on February 21, 2019,  for decreased and blurry visual acuity in the right eye, and complained he could hardly see at all, and indicated he wanted to proceed with cataract surgery. No pain, diplopia or distortion was noted, and Plaintiff was not using any drops at that time. The risks, benefits, and potential complications of cataract surgery were discussed. (ECF No. 32-5 at 16-18; ECF No. 32-2 at 4.)

On April 9, 2019, Dr. Alley referred him for cataract surgery with Dr. Wolff (ECF No. 32-5 at 12), which was authorized on April 17, 2019 (ECF No. 32-5 at 7).

Plaintiff saw an eye doctor on May 2, 2019, who noted Plaintiff had a cataract and decreased visual acuity in the right eye. (ECF No. 32-5 at 11.)

On May 16, 2019, Dr. Alley noted that Plaintiff reported his right-side thyroid felt enlarged, and he had a positive tremor in his outstretched hand. He was assessed as having a thyroid disorder, either hyperthyroid or hypo-parathyroid. The plan was to cancel his pending

1 right eye cataract surgery as he needed treatment for his thyroid. (ECF No. 32-5 at 7, 66.)

2 Plaintiff saw Dr. John Sutton, who assessed Plaintiff with thyrotoxicosis. (ECF No. No. 32-4 at

3 91-92; ECF No. 32-3 at 4.) On June 17, 2019, additional lab work was done, and he was

4 instructed to follow up with endocrinology. (ECF No. 32-5 at 66.)

5       He saw Dr. Sutton again in July and August, and multiple lab tests and a thyroid uptake

6 scan were ordered. (ECF No. 32-4 at 94-100.) On August 23, 2019, Dr. Sutton recommended an

7 anti-thyroid medication. (ECF No. 32-4 at 87; ECF No. 32-2 at 4.) He saw Dr. Sutton again on

8 September 11, 2019, and lab work for his thyroid was ordered. It was noted he did not have his

9 anti-thyroid medication, and Dr. Sutton said Plaintiff was supposed to have the medication.

10 (ECF No. 32-4 at 83;ECF No. 32-2 at 5.)

11       Plaintiff saw Dr. Seljestad on September 12, 2019 for his right eye cataract. He was

12 prescribed artificial tears and referred to an ophthalmologist. (ECF No. 32-4 at 79; ECF No. 32-2

13 at 5.) When he saw Dr. Alley that same day, it was noted that Plaintiff had not been picking up

14 his thyroid medication. (ECF No. 32-2 at 5.)

15       On September 24, 2019, Villegas requested referral for Plaintiff to an ophthalmologist,

16 noting Plaintiff had seen Dr. Seljestad on September 12, 2019, who recommended evaluation by

17 an ophthalmologist for the mature right-eye cataract. He was prescribed artificial teras.

18 (ECF No. 32-3 at 21; ECF No. 32-5 at 54.) The request for a referral to ophthalmology was

19 approved on October 2, 2019. (ECF No. 32-3 at 21.)

20       He continued to see Dr. Sutton in October and December of 2019, and on

21 December 14, 2019, Dr. Sutton said it was okay to proceed with the cataract surgery.

22 (ECF No. 32-4 at 70-78; ECF No. 32-5 at 45; ECF No. 32-2 at 5.)

23

Plaintiff saw Dr. Alley on January 13, 2020, who noted Plaintiff's cataract and referenced a September 24, 2019 authorized referral for an ophthalmology consultation, indicating Plaintiff needed an appointment and clearance. (ECF No. 32-5 at 64; ECF No. 32-2 at 5.) Plaintiff failed to show up for his February 12, 2020 appointment. (ECF No. 32-2 at 6.)

According to Dr. Naughton, Plaintiff was approved for his second cataract surgery in December 2019, but as a result of COVID-19, the procedure was delayed because it was not life-threatening. In addition, as a result of COVID-19, all inmates that want to see an outside specialist must agree to quarantine for 14 days upon their return to custody. (Naughton Decl., ECF No. 30-3 at 3 ¶¶ 8-9.)

The court ordered Defendants to supplement their motion with a status update regarding Plaintiff's right-eye cataract surgery given that the court is aware of another case where an inmate received cataract surgery in June of 2020. (ECF No. 40.)

Defendants filed a declaration of Dr. Naughton, recognizing that Plaintiff had received approval and a recommendation to receive right-eye cataract surgery on December 14, 2019, and a consultation was sent for an ophthalmologist, as well as for knee replacement, and a general surgeon for a possible sphincterotomy. Dr. Naughton states that Plaintiff had not yet received his right-eye cataract surgery because he has been receiving treatment for other medical issues, and then because of COVID-19 , as there were delays due to limits on non-emergent procedures, and there limits on staffing at NDOC for transportation as well as a backlog of appointments. Dr. Naughton says that Plaintiff has an appointment scheduled in May of 2021 with an ophthalmologist to address the need for cataract surgery in the right eye. (ECF No. 43-1 at 4.)

The court ordered Defendants to provide another supplement regarding the status of Plaintiff's right-eye cataract surgery by May 28, 2021. (ECF No. 44.) They filed the second

supplement on May 26, 2021. (ECF No. 45.) The supplement advises the court that Plaintiff saw

the ophthalmologist on May 6, 2021, and it was recommended that Plaintiff undergo cataract

surgery for his right eye, and the right-eye cataract surgery has been scheduled in June of 2021.

(ECF Nos. 45, 47-1.)

### b. Analysis

#### i. Left Eye

Plaintiff alleges that Defendants delayed providing surgery on either eye, and as a result

he lost his vision and suffered injuries when he was trying to navigate the prison.

Plaintiff was initially seen and diagnosed with a mature cataract on December 23, 2016,

and was told to return to the clinic for a follow up in six months, which would have been in June

of 2017. While Plaintiff was told in response to one kite in May of 2017 that he did not qualify

for cataract surgery under Medical Directive 123 (ECF No. 32-4 at 9); however, when he saw the

optometrist again, he was referred to ophthalmology, which was promptly approved by the

prison. There was a delay between the referral to ophthalmology was approved by the Utilization

Review Panel on October 31, 2017, until he saw the ophthalmologist nearly a year later on

September 14, 2018. The evidence reflects that this was due to the ophthalmologist retiring, and

NDOC having to procure a contract with a replacement ophthalmologist. When Plaintiff did see

Dr. Wolff on September 14, 2018, he recommended cataract surgery in the left eye, and this was

swiftly approved by the Utilization Review Panel on September 25, 2018, and Plaintiff had the

cataract surgery on his left eye on October 17, 2018.

While there was a delay in getting him in to see the ophthalmologist, the problem for

Plaintiff is that he did not file a response to Defendant's motion, and there is no evidence to

1 connect the delay in his seeing the ophthalmologist (due to the retirement of the prior doctor) to a

2 named Defendant in this action.

3    In addition, the record does not contain evidence to support Plaintiff's claim that he lost

4 his vision *because of* the delay. Nor is there evidence in the record to support Plaintiff's claim

5 that as a result of the delay in surgery he suffered injuries when he was trying to navigate the

6 prison. His medical records do not contain any discussion of injuries resulting from his vision

7 loss. Moreover, Plaintiff did not respond to the requests for admission propounded on him by

8 Defendants. Therefore, under Federal Rule of Civil Procedure 36(a)(3), (b), it is deemed

9 admitted that he never fell down the stairs while in NDOC custody, as he alleges in his

10 complaint. (ECF No. 32-6 at 12.)

11    In sum, there is no evidence before the court that the named Defendants were deliberately

12 indifferent to Plaintiff's serious medical need with respect to his left-eye cataract. Therefore,

13 summary judgment should be granted in Defendants' favor as to this aspect of his Eighth

14 Amendment claim.

15                          **ii. Right Eye**

16    Plaintiff alleges that after Defendants conducted surgery on his left eye, they refused to

17 perform surgery on the right eye because he had one good eye.

18    The evidence does not reflect that Defendants refused to perform surgery on the right eye

19 because Plaintiff had one good eye. Instead, the evidence demonstrates that Plaintiff requested

20 surgery on the right eye shortly after the left eye surgery, and he saw the eye doctor within a

21 month at the end of December 2018, and was given artificial tears. When he sent a kite that he

22 was in pain in the beginning of January, he saw the eye doctor later that month, who promptly

23 referred him to the ophthalmologist, which was also promptly authorized. Dr. Wolff

recommended cataract surgery. The right-eye cataract surgery was requested and authorized within a reasonable amount of time on April 17, 2019. Plaintiff saw the eye doctor again at the beginning of May 2019, and then he began to have thyroid issues in the middle of May and his cataract surgery had to be cancelled while he was treated for his thyroid issues. As soon as his endocrinologist said that he could proceed with cataract surgery, it was authorized again. Unfortunately, the surgery had to be further postponed due to the COVID-19 pandemic and difficulties getting such procedures scheduled, as is detailed in Defendants' supplements. Plaintiff saw the optometrist in the beginning of May of 2021, and is now scheduled for right-eye cataract surgery in June of 2021.

Plaintiff did not respond to the requests for admission propounded on him by Defendants. Therefore it is deemed admitted that he saw medical on April 5, 2017, May 24, 2017, and September 28, 2017, and he did not mention blindness, pressure pain or headaches; and, when he saw Dr. Wolff on September 14, 2018, he did not mention pressure or headaches. He also admits that he never fell down the stairs while in NDOC custody. (ECF No. 32-6 at 12.) Plaintiff further admits that Nurse Keast's only involvement was responding to first and second level grievances, and she denied the first level grievance because Plaintiff "no-showed" an eye appointment on September 28, 2017, and then was rescheduled to October 12, 2017. (ECF No. 32-6 at 15.) In addition, he admits that Nurse Candis' only involvement was responding to a first level grievance. (ECF No. 32-6 at 15.)

There is certainly no evidence before the court that the delays in his having right eye cataract surgery, first because he was receiving treatment for his thyroid issues, and then because of the pandemic, were due to deliberate indifference of a named Defendant. Therefore, summary

judgment should be granted in Defendants' favor with respect to his Eighth Amendment claim regarding his right-eye cataract.

**2. Knees**

**a. Summary of Medical Evidence re: Plaintiff's Knees**

On intake to NDOC, Plaintiff complained of chronic knee pain, and having had a stroke 18 months prior to incarceration. He was described as morbidly obese at 5 feet six inches and 266 pounds.. (ECF No. 32-2 at 2.)

On October 20, 2016, Plaintiff requested a cane for his right knee pain, as well as pain management. (ECF No. 32-4 at 18.)

He saw Dr. Johns again on December 12, 2016, and it was noted he had gained weight since incarceration and was "grossly obese." He complained of bilateral knee pain. (ECF No. 32-5 at 72; ECF No. 32-2 at 2.)

Plaintiff sent a kite on March 20, 2017, that both of his knees were swollen and he was in pain and could barely walk, and the walking cane was not helping. The response has a notation of "4/5/17," presumably referring to Plaintiff's appointment. (ECF No. 32-4 at 8.)

On April 5, 2017, he saw Villegas for complaints knee pain which had worsened to the point it was hard to walk. He reported he previously worked in tile construction where he would kneel on the ground and carry heavy loads. He was observed as ambulating slowly, with bilateral swelling in the knees. He had severe obesity. Bilateral knee x-rays were ordered, he was issued knee sleeves, he was given knee rehabilitation exercises and naproxen for pain, and an orthopedic consultation was ordered. (ECF No. 32-5 at 43, 62, 71; ECF No. 32-2 at 2.)

On May 8, 2017, Plaintiff sent a kite asking to follow up regarding the x-rays of his knees. (ECF No. 32-4 at 4.)

On May 14, 2017, he saw Dr. Everts for his complaints of bilateral knee pain. He had lost some weight over the past year. The x-ray showed degenerative changes. He was assessed with bilateral osteoarthritis and morbid obesity. He was instructed to lose weight and take NSAIDs for pain. (ECF No. 32-2 at 2; ECF No. 32-3 at 40-41.) He was issued knee sleeves on May 18, 2017. (ECF No. 32-4 at 55.) Plaintiff was seen on May 24, 2017, for complaints of bilateral knee pain. He was instructed to lose weight and use NSAIDs for pain (he was prescribed 800 mg of ibuprofen that day). (ECF No. 32-5 at 61, 71.)

Plaintiff saw Dr. Walls on June 5, 2017, for his chronic left knee pain. He walked with discomfort. At that time, he was walking without aide, with a slight limp. X-rays showed medial bone on bone alignment of each knee. He was assessed with bilateral knee degenerative joint disease, and obesity. Dr. Walls recommended weight loss to decrease the pressure on his knees, and if this was not successful the next step would be other NSAIDs or a cortisone shot to relieve his pain. (ECF No. 32-5 at 41.)

Plaintiff sent a kite on July 31, 2017, stating he wanted to follow up to discuss his x-rays, noting his pain was getting worse and that it was harder to walk. (ECF No. 32-3 at 97.)

He saw Villegas on September 28, 2017, for knee pain. He had mild bilateral knee edema. He was assessed with possible advancing osteoarthritis. Repeat x-rays were ordered, and he was instructed to continue wearing the knee sleeves, use a cream, and he was switched to a walker from the cane. He was also instructed to lose weight, and was referred to Dr. Walls for a follow up. (ECF No. 32-5 at 61, 71; ECF No. 32-2 at 2.) X-rays on October 2, 2017, showed persistent marked medial compartment joint space loss and osteoarthritis. (ECF No. 32-3 at 37.) Moderate to severe osteoarthritic changes were prominent in the medial compartment in the left

knee, with a small suprapatellar joint effusion. (ECF No. 32-3 at 39.) Plaintiff's cane was switched out for a walker on October 2, 2017. (ECF No. 4 at 55.)

Plaintiff saw Dr. Walls for his complaints of worsening knee pain on October 16, 2017. He noted that Plaintiff walked well with his walker. He was assessed with bilateral knee degenerative joint disease. He told Dr. Walls that his doctors were checking his thyroid studies. Dr. Walls recommended weight loss. The future plan was a cortisone injection in the left knee if he wanted to proceed. He further noted that future total knee replacements were a possible option. (ECF No. 32-5 at 37; ECF No. 32-2 at 2-3.) On October 24, 2017, Dr. Naughton requested that Plaintiff be scheduled for a cortisone injection on the left knee with Dr. Walls. (ECF No. 32-5 at 34.)

Plaintiff saw Dr. Walls again on November 22, 2017, and Dr. Walls discussed the options and risks, and Plaintiff requested and was given a left knee cortisone injection. (ECF No. 32-2 at 3; ECF No. 32-5 at 33.)

There is a note from nursing on December 7, 2017, that Plaintiff complained of problems with his walker, and he received a new one. He also complained of dizziness and numbness in his finger with lying down. (ECF No. 32-2 at 3.) An appointment was scheduled but he did not show up. (*Id.*)

Plaintiff was a "no show" for a December 11, 2017 appointment (ECF No. 32-5 at 70.) There is a notation on December 18, 2017 that Plaintiff filed a grievance regarding his knee pain. The grievance was described as being resolved as there was documentation of orthopedic consultations, and Plaintiff having multiple "no shows." (ECF No. 32-5 at 70.)

Plaintiff sent a kite on January 7, 2018, stating that he needed his right knee examined and treated due to intense pain and difficulty moving around. There is a notation that Plaintiff was seen on January 30, 2018. (ECF No. 32-3 at 69.) He sent another kite on January 16, 2018, complaining that his knees were swollen and painful, and that he could not walk. (ECF No. 32-3 at 88.)

He saw Dr. Johns for his annual exam on January 29, 2018. She described him as using a walker, and having bilateral knee pain/arthritis and was grossly obese at 280 pounds. (ECF No. 32-2 at 2.) He saw Dr. Johns for complaints of knee pain again on March 14, 2018. (ECF No. 32-2 at 3.)

On February 16, 2018, Plaintiff asked for an appointment with the knee specialist for his pain, noting he did not have pain medication. (ECF No. 32-3 at 87.)

On March 7, 2018, Plaintiff sent a kite stating his knees were swollen and causing him pain, and asked about an appointment. (ECF No. 32-3 at 85.) He was seen by a nurse on March 14, 2018. (ECF No. 32-5 at 70.)

On April 4, 2018, his prescription for Capsaicin cream was renewed, that he was to apply to his knees, and his Excedrin prescription was also renewed. (ECF No. 32-5 at 60.)

He saw Dr. Naughton on April 11, 2018, for his knee pain. He reported that the left knee injection helped for about a month, and requested a repeat injection. His knee was injected with Lidocaine and Kenalog, and he asked to return for an injection in the right knee. (ECF No. 32-5 at 69; ECF No. 32-2 at 3; ECF No. 32-4 at 54.)

He saw Dr. Naughton again on July 2, 2018, requesting pain medication for his knee pain. It was noted that his ibuprofen had been stopped because a of a question on his kidney

panel and creatinine being slightly above normal; however, the re-test was normal, and Plaintiff was started on Indocin for pain. (ECF No. 32-5 at 69; ECF No. 32-2 at 3.)

He was seen by Dr. Alley for his pre-operative examination prior to cataract surgery on October 11, 2018, and it was noted that he had degenerative joint disease of the bilateral knees, but was not a good candidate for joint replacement due to obesity. He was advised to lose weight, and decrease carbs and sugar. He was given Tylenol for pain. (ECF No. 32-2 at 3.)

On November 21, 2018, Plaintiff sent a kite stating that he saw a nurse two months ago who said she was going to make an appointment regarding Plaintiff's knees, and he asked what happened. In response, he was told he had pending appointments. (ECF No. 32-3 at 72.)

On January 10, 2019, he complained of knee pain and was given over-the-counter ibuprofen and Tylenol to alternate.  (ECF No. 32-5 at 58, 68.)

Plaintiff sent a kite on January 21, 2019, asking to be seen for his knee pain. (ECF No. 32-5 at 77.)

Plaintiff saw Dr. McKee on January 31, 2019, for his knee pain. He reported that Dr. Naughton had injected the left knee, but the right knee was worse. He did not want acetaminophen or ibuprofen and did not want to do walking. He was offered BenGay and to see an orthopedist. He refused the BenGay. He was offered a steroid shot in his right knee, which he accepted, and was to follow up in a week after the steroid injection. (ECF No. 32-5 at 67; ECF No. 32-2 at 4.) Plaintiff was also referred Plaintiff for an orthopedic consultation that day. (ECF No. 32-5 at 21.)

He saw Dr. Alley on March 28, 2019, and was assessed with right knee osteoarthritis with advanced arthritis of the medial compartment. Dr. Alley said that orders for x-rays and a referral to an orthopedist were written previously. (ECF No. 32-5 at 67; ECF No. 32-2 at 4.) That

day, Dr. Alley referred Plaintiff for an orthopedic consultation for chronic right knee pain, noting

the prior request from January 13, 2019, and that Plaintiff had new x-rays pending. This was

approved on April 4, 2019. (ECF No. 32-5 at 14.)

On May 16, 2019, Dr. Alley noted Plaintiff's thyroid issues. (ECF No. 32-2 at 4.)

Plaintiff saw the orthopedist, Dr. Walls, on June 10, 2019. He reported that both knees

would catch and give way. He had been using a walker for a year and a half. He had two knee

cortisone injections which helped for a couple of days. He was assessed with bilateral knee

degenerative joint disease, with the left more symptomatic than the right. Plaintiff requested a

left knee replacement. Dr. Walls recommended consultation with a joint replacement orthopedic

surgeon,  and indicated Plaintiff would need physical therapy after surgery to avoid limited

motion. (ECF No. 32-5 at 5; ECF No. 32-2 at 4.) On June 10, 2019, a request was placed to

schedule a consultation for his bilateral knee pain. This was approved on June 20, 2019.

(ECF No. 33-3 at 22.)

Plaintiff continued to be seen for his thyroid issues, and had lab work done and was

prescribed medication. (ECF No. 32-2 at 5.) When he saw Dr. Alley on September 12, 2019, he

was advised he needed to lose weight and decrease carbs and sugar and perform exercises.

(ECF No. 32-5 at 65; ECF No. 32-2 at 5.)

Plaintiff was a "no show" for his December 5, 2019 appointment. (ECF No. 325 at 65.)

Plaintiff saw Dr. Alley on January 13, 2020, who noted Plaintiff had continued bilateral

knee pain with swelling. He asked to have his Excedrin refilled. His hyperthyroidism was

described as controlled at that time. He was also assessed with bilateral knee degenerative joint

disease and cataracts. He was ordered Metformin and Excedrin. He was also referred for a knee

replacement consultation, and he was to follow up in six weeks. (ECF No. 32-5 at 65; ECF No. 32-2 at 5.)

On January 13, 2020, Dr. Alley referred Plaintiff for a consultation with an orthopedist that performs joint replacement regarding possible left knee replacement per Dr. Walls' request, noting the original request had been written on June 10, 2019. (ECF No. 32-5 at 51; ECF No. 32-3 at 19.) The request was authorized. (*Id.*)

Plaintiff did not show up to his February 10, 2020 appointment. (ECF No. 32-2 at 5.)

Plaintiff saw Sanjai Shukla, M.D. at Reno Orthopedic Clinic on July 7, 2020 for his knee pain. He described a dull achy pain on a daily basis, and inability to exercise. He also reported a thyroid problem which was causing him to gain weight. (ECF No. 32-3 at 2.) X-rays were taken which showed evidence of arthritic changes, including bone-on-bone arthritis in the medial compartment, deformities, osteophyte formation, and subchondral sclerosis. Dr. Shukla said the plan was to put in for approval for injections under ultrasound guidance. Plaintiff was told about various treatment options for osteoarthritis for the knee, including anti-inflammatory medications, steroid injections, physical therapy, and eventually knee replacements. Dr. Shukla discussed that Plaintiff's morbid obesity and inability to comply with a rehabilitation protocol secondary to his incarceration would likely preclude him from being a candidate for an elective joint replacement. Dr. Shulka noted, however, that if Plaintiff fails conservative management, he was happy to put in for approval for knee replacement, though Plaintiff is at high risk for complications including fractures, infections, and blood clots. Dr. Shukla further advised that Plaintiff needed to lose weight before an elective procedure. (ECF No. 32-3 at 3.)

**b. Analysis**

The evidence presented by Defendants directly contradicts Plaintiff's claim that defendants Drs. Naughton, Johns and Walls were deliberately indifferent to Plaintiff's serious medical need concerning his knees and that they refused to provide him with corrective treatment. Instead, the record reflects that Plaintiff complained of bilateral knee pain on intake into NDOC and was seen not long thereafter. He requested and was issued a cane, and when he sent kites complaining of pain, he was seen within a reasonable amount of time. X-rays were ordered, he was issued knee sleeves, he was given knee rehabilitation exercises, and was instructed to lose weight and change his diet. He was prescribed various pain medications and creams, some of which he refused. His cane was changed out for a walker when he complained the cane was not effective. He was also given cortisone injections and was referred for orthopedic consultations, which were promptly approved. The orthopedist, Dr. Walls, recommended consultation with a joint replacement surgeon, which was also promptly approved, although delayed for a period of time while Plaintiff's thyroid issues were addressed and brought under control.

Plaintiff then saw Dr. Shukla, who recommended proceeding conservatively first with a steroid injection under ultrasound guidance. Dr. Shukla said that knee replacement may eventually be the remaining option if conservative treatment fails, but noted Plaintiff was not a good candidate due to his morbid obesity and inability to comply with the rehabilitation protocol, highlighting that Plaintiff would have to lose weight before he could proceed with this surgery.

In sum, contrary to Plaintiff's allegations, his medical records reflect that he received continuous, appropriate and prompt care to address his complaints of bilateral knee pain.

1  Therefore, summary judgment should be granted in favor of Drs. Naughton, Johns, and Walls as

2  to the Eighth Amendment claim regarding Plaintiff's bilateral knee pain.

3  **B. ADA**

4        Plaintiff claims that Mattice and Baca refused to give Plaintiff an inmate aide or allow

5  another inmate to help him when he was experiencing difficulty seeing as a result of his

6  cataracts. The court is recommending that Mattice be dismissed from this action; therefore, Baca

7  is the only defendant remaining as to this claim.

8        According to Defendants, Plaintiff failed to file a grievance requesting an

9  accommodation under the ADA; he did not submit an accommodation request on NDOC's form;

10  he did not come in to prison with a confirmed ADA accommodation; and he did not submit the

11  request through a kite.

12        The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought

13  with respect to prison conditions under section 1983 of this title, or any other Federal law, by a

14  prisoner confined in any jail, prison, or other correctional facility until such administrative

15  remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his

16  administrative remedies irrespective of the forms of relief sought and offered through

17  administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

18        "If undisputed evidence viewed in the light most favorable to the prisoner shows a failure

19  to exhaust, a defendant is entitled to summary judgment under Rule 56." *Albino v. Baca*, 747

20  F.3d 1162, 1168, 1170-71 (9th Cir. 2014) (citations omitted). Once a defendant shows that the

21  plaintiff did not exhaust available administrative remedies, the burden shifts to the plaintiff "to

22  come forward with evidence showing that there is something in his particular case that made the

23  existing and generally available administrative remedies effectively unavailable to him." *Id*. at

25

1172 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996)); *Draper v. Rosario,* 836 F.3d 1072, 1080 (9th Cir. 2016) (inmate plaintiff did not meet his burden when he failed to identify any actions prison staff took that impeded his ability to exhaust his administrative remedies, or otherwise explain why he failed to comply with the administrative remedies process)).

In *O'Guinn v. Lovelock Correctional Center*, 502 F.3d 1056 (9th Cir. 2007), the Ninth Circuit held that the PLRA requires administrative exhaustion of ADA [  ] claims." *O'Guinn*, 502 F.3d at 1059-60. The court noted that the plain language of the PLRA, which says that no action shall be brought under section 1983 "*or any other Federal law,*" requires exhaustion before bringing a claim under the ADA, which is a federal law. *Id*. at 1061. The court did discuss that outside the PLRA context, there is no exhaustion requirement for claims brought under Title II of the ADA. *Id*. (citations omitted). The court went on to state, however, that while the ADA itself does not have an exhaustion provision, it would defeat congressional intent "if prisoners were able to bring federal suits directly in district court whenever a federal statute lacked an exhaustion provision." *Id*. Therefore, the Ninth Circuit held that the PLRA "require[es] prisoners to exhaust prison administrative remedies for claims under Title II of the ADA … notwithstanding the absence of a federal administrative exhaustion requirement in these statutes." *Id*. at 1061-62.

NDOC's Administrative Regulation (AR) 740 sets out the inmate grievance procedure within NDOC. (ECF No. 30-8.) An inmate is required to first try to informally resolve his issue with staff, and then file grievances at the informal, first and second levels to complete the exhaustion process. (*Id*.)

Defendants have provided the declaration of Kathryn Reynolds, NDOC's Administrative Services Officer II at NNCC, who states that she has reviewed Plaintiff's records and nowhere is there any ADA modification request form or notation indicating Plaintiff requested an ADA modification. (ECF No. 30-5 at 3 ¶¶ 8-9.)

Plaintiff did not respond to counter Defendants' evidence that he did not exhaust his administrative remedies with respect to his claim that he was denied a reasonable accommodation under the ADA. Therefore, summary judgment should be granted in defendant Baca's favor as to the ADA claim.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order:

(1) **DISMISSING** Wesley Mattice **WITHOUT PREJUDICE** under Federal Rule of Civil Procedure 4(m);

(2) **DISMISSING** the Doe optometrist **WITHOUT PREJUDICE** as Plaintiff never identified that defendant; and

(3) **GRANTING** Defendants' motion for summary judgment (ECF No. 30).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: May 26, 2021

_____
William G. Cobb
United States Magistrate Judge